**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**ST. JOSEPH DIVISION**

| | |
|---|---|
| STACY ARNOLD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )     Case No. 19-06137-CV-SJ-BP |
| CITY OF ST. JOSEPH, | ) |
| ST. JOSEPH PUBLIC LIBRARY, | ) |
| OFFICER REBECCA HAILEY (IN HER | ) |
| PERSONAL AND PROFESSIONAL CAPACITY) | ) |
| AND ROGER CLARY | ) |
| | ) |
| | ) |
| Defendants | ) |

### SUGGESTIONS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNT I

COMES NOW, Plaintiff, Stacy Arnold, and, in accordance with Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, presents these suggestions in support of her motion for summary judgment on Count I of her First Amended Complaint (ECF 19).

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ iii

I.    STATEMENTS OF UNDISPUTED MATERIAL FACT ................................................1

II.    ARGUMENT .................................................................................................................9

    A.    *Private Property Used for Public Purposes, Like Public Property, is Explicitly Subject to First Amendment Scrutiny*…………………………..…..9

    B.    *First Amendment Protections Present Practicality Questions and When Viewed Through "Forum Analysis" Also Present Unique Interpretive Challenges, Namely a Lack of Cohesion and Consensus Regarding the Content and Significance of The Categories. This Presents Multiple Paths to First Amendment Protection and Lengthens Briefs* ..............................12

    C.    *The Ability to Petition on the External Grounds of a Library Survives a Reasonableness Review* ...................................................................................17

    D.    *Strict Scrutiny Applies Anyway*........................................................................23

        1.    *The Sidewalk in Front of the East Hills Library and Others Like it are Traditional Public Fora*...........................................................23

        2.    *The Exterior Grounds of a Public Library are Traditional or Designated Public Fora* .................................................................26

    E.    *The Library Policy is not Narrowly Tailored and Moreover Fails to Select a Simple, Available Alternative* .........................................................................31

    F.    *The Library Policy is Impermissibly Vague*........................................................33

    G.    *Forum Analysis is also Impermissibly Vague*.....................................................34

    H.    *The Historic Confines of First Amendment Rights are Substantial* ......................37

III.    CONCLUSION.............................................................................................................40

# TABLE OF AUTHORITIES

## Cases

ACLU of Nevada v. City of Las Vegas, 333 F.3d 1092 (9th Cir. 2003) ............................... 15, 30

Adderley v. Florida 385 U.S. 39 (1966) .................................................................................. 13
.
Bowman v. White, 444 F.3d 967 (8th Cir. 2006) ....................................................................... 15

Brister v. Faulkner, 214 F.3d 675 (5th Cir. 2000) ................................................................... 12

Brown v. Louisiana, 383 U.S. 131 (1966) ............................................................................... 13

Citizens United v. Fed. Election Comm'n, 558 U.S. 310 (2010) ............................... 26, 27, 35, 36

Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,
    473 U.S. 788 (1985) ........................................................ 10, 11, 12, 17, 18, 19, 28, n.3

Cox v. Louisiana, 379 U.S. 536 (1964) .................................................................................... 13

Cox v. New Hampshire, 312 U.S. 569 (1941) ...................................................................... 14, 40

Davis v. Commonwealth of Massachusetts, 167 U.S. 43 (1897) ................................................ 12

Deans v. Las Vegas Clark Cnty. Library Dist., 220 F.Supp. 3d 1058
    (District of Nevada, 2016) ............................................................................................ 31

De Jonge v. Oregon, 299 U.S. 353 (1937) ............................................................................... 17

Doe v. City of Albuquerque, 667 F.3d 1111 (10th Cir. 2012) .................................................... 30

Edwards v. South Carolina, 372 U.S. 229 (1962) .................................................................... 13

Fed. Election Comm'n v. Wis. Right to Life, Inc, 551 U.S. 449 (2007) .......................... 26, 35, 36

First Unitarian Church of Salt Lake City v. Salt Lake City Corp, 308 F.3d 1114
    (10th Cir. 2002) ................................................................................................. 11, n.1

Freedom from Religion Foundation v. City of Marshfield, 203 F.3d 487 (7th Cir. 2000) .... 11, n.1

Frisby v. Schultz, 487 U.S. 474 (1988) .................................................................................... 23

Grayned v. City of Rockford, 408 U.S. 104 (1972) ...................................... 19, 28, 31, 33, 34, 40

Groene v. Seng,  No. 06-cv-3153, 2006, WL 5680261 (D. Neb. June 29, 2006) .................. 24, 26

Hague v. CIO, 307 U.S. 496 (1939)................................................................. 10, 13, 16, 39, 40

Heffron v. International Society for Krishna Consciousness, Inc.,
    452 U.S. 640 (1981) ......................................................................................... 24

Internal Soc. for Krishna Consciousness v. Lee, 505 U.S. 672 (1992)................................. passim

Jamison v. Texas, 318 U.S. 413, 416 (1943)............................................................... 40

Jews for Jesus v. Massachusetts Bay Transp. Auth., 984 F.2d 1319 (1st Cir. 1993) ................. n.5

Keister v. Bell. 879 F.3d 1282 (11th Cir. 2018) ....................................................... n.9

Kreimer v. Bureau of Police for Town of Morristown, 958 F.2d 1242
    (3rd Cir. 1992).............................................................................................. 30

Lederman v. United States, 291 F.3d 36 (D.C. Cir. 2002)............................................... 25

Lehman v. City of Shaker Heights, 418 U.S. 298 (1974) ................................................ 19

Lloyd Corporation Ltd v. Tanner, 407 U.S. 551 (1972) ................................... 9, 10, 23, 37, 38, 40

Lu v. Hulme, 133 F. Supp. 3d 312 (D. Mass. 2015)...................................................... 18

Marsh v. Alabama, 326 U.S. 501 (1946).................................................................. 9, 10

McCullen v. Coakley, 134 S. Ct. 2518 (2014) ........................................................... 22

Members of City Council of Los Angeles v. Taxpayers for Vincent,
    466 U.S. 789 (1983) ......................................................................................... 19

Meyer v. Grant, 486 U.S. 414 (1988) ................................................................. 22, 27

Minn. Voters All. v. Mansky, 138 S. Ct. 1876 (2018)................................................. 14, 40, n.7

NAACP v. City of Philadelphia, 39 F. Supp. 3d 611
    (Eastern District of Pennsylvania, 2014) ...................................................... 15

NAACP v. City of Philadelphia, 834 F.3d 435 (3rd Cir. 2016) ......................................... 20, n.3

New York Times Co. v. Sullivan, 376 U.S. 254 (1964) .................................................. 36

Obergefell v. Hodges, 135 S. Ct. 258 (2015) ............................................................ 36

<u>Perry Educ. Ass'n. V. Perry Local Educators' Ass'n</u>, 460 U.S. 37 (1983)............... 14, 19, 28, 30

<u>Prigmore v. City of Redding</u>, 211 Cal. App. 4th 1322 (2012) ............................................ 25, 30

<u>Pruneyard Shopping Ctr. v. Robins</u>, 447 U.S. 74 (1980) ........................................................ 9, 39

<u>Sammartano v. First Judicial Dist. Court</u>, 303 F.3d 959 (9th Cir. 2002) .................................... 32

<u>Schneider v. State</u>, 308 U.S. 147 (1939) ............................................................................ 29, 40

<u>Snyder v. Phelps</u>, 562 U.S. 443 (2010) ...................................................................................... 36

<u>Terminiello v. Chicago</u>, 337 U.S. 1 (1949) ............................................................. 18, 28, 29, 31

<u>Thornhill v. State of Alabama</u>, 310 U.S. 88 (1940) ............................................................... 37, 39

<u>United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland, Inc.</u>,
      383 F.3d 449 (6th Cir. 2004).................................................................................... 11, n.1

<u>United States v. Grace</u>, 461 U.S. 171 (1983) .................................................................... 13, 23

<u>United States v. Kokinda</u>, 497 U.S. 720 (1990) .................................................................. passim

<u>United States v. Stevens</u>, 559 U.S. 460 (2010) ........................................................................... 35

<u>United States Postal Serv. v. Council of Greenburgh Civic Ass'ns</u>,
      453 U.S. 114 (1981) ......................................................................................................... 19

<u>Venetian Casino Resort, L.L.C. v. Local Joint Exec. Bd.</u>, 257 F.3d 937 (9th Cir. 2000)...... 11, n.1

<u>Ward v. Rock Against Racism</u>, 491 U.S. 781 (1989) ............................................................ 31, 32

<u>Warren v. Fairfax County</u>, 196 F.3d 186 (4th Cir. 1999) ..................................................... 15, 30

**<u>Other Authorities</u>**

<u>Intellectual Freedom Policies. Library Bill of Rights.</u> St. Joseph Public Library.
      Accessed on 7/30/2020.
      https://sjpl.lib.mo.us/policies/intellectual-freedom-policies/ .................................... 20, 30

<u>Second Day of Hearings on the Nomination of Judge Roberts</u>, The New York Times,
      (Sept.13, 2005), www.nytimes.com/2005/09/13/politics/politicsspecial1/
      second-day-of-hearings-on-the-nomination-of-judge.html ........................................... 16

U.S. Const. Amend. 1.............................................................................................................27

## STATEMENTS OF UNDISPUTED MATERIAL FACTS

1.  On or around noon on January 30, 2018, Plaintiff was circulating a petition in front of the East Hills Library, a library within the St. Joseph Public Library Branch. (ECF 24 ¶ 12).  See also excerpts from the Library's 26a disclosures—SJPL000001, 2—attached hereto as Exhibit 1.

2.  The East Hills Library, a separate physical structure from the East Hills Mall, is accessed from a vehicular right-of-way from which one can also access the East Hills Mall, Office Depot, JOANNE Fabrics and Crafts, New China Super Buffet, and other businesses. Below is a picture of the Library, retrieved from Google maps.



It is approximately four tenths of a mile from the intersection of Frederick Avenue and North Woodbine Road to the East Hills Library. The two pictures that follow are from google maps.

The first is a larger aerial view which includes the entire mall, and the second focuses in a bit more on the Library (the public bus stops are also visible).





Pictures of the turn-off to the vehicular right-of-way that leads to the Library and the vehicular right-of-way are shown below. Once again, both pictures are from google maps.





3.  Shortly after 12pm on January 30, 2018, Roger Clary, a mall security guard, told Plaintiff that she could not petition at the Library, that the mall owned the entire Library and no one had ever been allowed to petition there. At no point did he inform Plaintiff of the existence of a designated area and ask Plaintiff to move to and/or remain in said area. He also called the police. (ECF 24 ¶ 17, 18, 21). See also East Hills Security Department Incident Report, pp. 2, excerpted from *Roger Clary's Responses to Plaintiff's Requests for Production of Documents To Def. Clary* attached hereto as Exhibit 2 as well as excerpts from *Roger Clary's Answers to Plaintiff's First Interrog. To Def. Clary* at Interrog. 6-7, attached hereto as Exhibit 3.

4.  On or around 12:30pm on January 30, 2018, Defendant Hailey, a police officer for the City of St. Joseph, placed Plaintiff under arrest. (ECF 26 ¶ 16).

5.  The arrest occurred after Plaintiff had communicated her belief to her arresting officer, Defendant Hailey, that the area in question was a public forum, communicated to Defendant Hailey that she would not disobey an order, communicated to Defendant Hailey that she, Plaintiff, would leave if Defendant Hailey wanted her to leave, and asked Defendant Hailey for her badge number. See Exhibit E from ECF 19, which was delivered to the Court along with Plaintiff's Complaint in the form of an audio CD.

6. Plaintiff was subsequently charged with trespassing, St. Joseph City Ordinance 20-51. See Plaintiff's ticket, attached hereto as Exhibit 4.

7. St. Joseph City Ordinance 20-51 reads as follows: "Trespass. (a) A person commits the offense of trespass if he enters or remains unlawfully upon real property of another. The fact that a person has no intent to enter unlawfully or remain unlawfully is no defense to this section. (b) A person enters unlawfully or remains unlawfully in or upon premises when he is not licensed or privileged to do so. A person who, regardless of his purpose, enters or remains in or upon premises which are at the time open to the public does so with license and privilege unless he defies a lawful order not to enter or remain, personally communicated to him by the owner of such premises or by other authorized person. A license or privilege to enter or remain in a building which is only partly open to the public is not a license or privilege to enter or remain in that part of the building which is not open to the public. (c) Trespass is a misdemeanor.

7. The East Hills Mall and the East Hills Library have separate addresses. The address of the East Hills Mall is 3702 Frederick Ave, St. Joseph, MO 64506. The address of the East Hills Library is 502 N Woodbine Rd, St. Joseph, MO 64506. (ECF 24 ¶ 36); (ECF 26 ¶ 20). The address listed on Plaintiff's trespass ticket was the address for the mall.

8. There is a sidewalk that runs parallel to the entrance of the East Hills Library. (ECF 24 ¶ 37) For pictures, see ECF 19, Exhibits G, H, I & J.

9. Although it extends far beyond the library doors, the sidewalk has a beginning and an end. (ECF 24 ¶ 37).

10. In front of the sidewalk is a single row of parking spaces, in front of the spaces is a vehicular pass-through that cars must utilize to access the library, and on the other side of the vehicular pass-through sits the mall parking lot. (ECF 24 ¶ 37).

11. A statue of a girl with a dove surrounded by sidewalk now stands in place of what was once five parking spaces in the single row of spaces in front of the library. (ECF 24 ¶ 37). See also ECF 19, Exhibit K.

12. The sidewalk surrounding the statue is intertwined with and physically indistinguishable from the sidewalk that is parallel to the library. (ECF 24 ¶ 37).

13. There are four benches, two to the right and two to the left of the statue. (ECF 24 ¶ 37).

14. Between the statue and the sidewalk are rocks. (ECF 24 ¶ 37).

15. There was, at the time of Plaintiff's arrest, and on January 2, 2019, a sign in the rocks that read: "Rock Garden/Take a rock for inspiration/Share one for motivation/or/Leave a rock to help the garden grow!" (ECF 24 ¶ 37). See ECF 19, Exhibit L for a picture.

16. Messages as well as artwork were displayed on some of the rocks in the garden. (ECF 24 ¶ 37).

17. There is a plaque in front of the statue that reads: "Girl With Dove/Artist: Tom Corbin/Generously donated to the St. Joseph Public Library by the Bradley Charitable Trust and the William T. Kemper Foundation Commerce Bank, Trustee." (ECF 24 ¶ 37). See ECF 19, Exhibit M for a picture.

18. According to Google maps, public bus stops 13 and 19 are located in front of the statue.

19. The Library owns the property from and including the portions of the sidewalk that are parallel to the Library (not to include the parts of the sidewalk to the front, right, and left of the statue), and the East Hills Mall owns the parking spaces and the vehicular pass-through. See the Library final plat excerpted from the Library's initial 26(a) disclosures—SJPL000007—attached hereto as Exhibit 5. See also ECF 19, Exhibits N and O.

20. An area where five parking spaces used to be is owned by the mall with an easement granted to the Library for the purpose of the installation of a statue and related landscaping. See excerpts from the Library's initial 26(a) disclosures—SJPL000008 - SJPL000009—attached hereto as Exhibit 6. See also ECF 19, Exhibit P.

21. The Library had a published policy on petitioning and the distribution of literature at the time of Plaintiff's arrest. This policy indicated that petitioning was allowed in undifferentiated "areas designated by staff," and that petitioners were "not to pursue patrons." See an excerpt from the Library's 26(a) disclosures—SJPL000005—attached hereto as Exhibit 7.

22. Another similar, but more detailed policy was implemented on 8/23/2019. This is the current policy as of 10/11/2020. It maintained the "pursue patrons" language from the initial policy as well as the designated areas; it also included a picture indicating where the designated area at the East Hills Library is located. See an excerpt from the Library's 26(a) disclosures—SJPL000010 – SJPL000011—attached hereto as Exhibit 8.

23. Plaintiff returned to the external grounds of the East Hills Library on several occasions in February 2020 to petition for another cause that she cares about. (ECF 45, Ex. 1 ¶ 23). Plaintiff wanted to petition as she was doing before her arrest on 1/30/2018, but, for fear of arrest, Plaintiff confined herself to what she interpreted as the designated area. (ECF 45, Ex. 1 ¶¶ 4 & 5).

24. In February 2020, Plaintiff received two different verbal interpretations of the designated area from East Hills Library staff that were more restrictive than the area indicated on the written policy (ECF 45, Ex. 1 ¶¶ 6, 7, & 19).

25. The Library was asked to produce any records or studies which may indicate that

petitioning on its external grounds interferes with its intended purpose and the Library produced no such records. See excerpts from *St. Joseph Public Library's Responses to Plaintiff's Request for Production of Documents To Def. Library* at Request No. 2, attached hereto as Exhibit 9. Moreover, the Library was asked in an interrogatory if the designated area served a purpose that could not similarly be served by requiring that petitioning take place a reasonable distance from the entrance, and the Library indicated no reason, and, indeed, seemed confused by the question. See excerpts from *St. Joseph Public Library's Answers to Plaintiff's First Interrog. To St. Joseph Public Library* at Interrog. 8, attached hereto as Exhibit 10.

26. Plaintiff would like to return to the East Hills Library in the future to petition for another cause that she cares about and to participate in expressive activities. While Plaintiff does not wish to impede the ingress or egress of Library patrons, Plaintiff would like to petition on the external grounds of the public East Hills Library, regardless of title, without being confined to a designated area or other paternalistic constraints, without being burdened by ambiguity of interpretation, and without fear of arrest.

**ARGUMENT**

A.     **PRIVATE PROPERTY USED FOR PUBLIC PURPOSES, LIKE PUBLIC PROPERTY, IS EXPLICITLY SUBJECT TO FIRST AMENDMENT SCRUTINY.**

> It would not be surprising in the future to see cities rely more and more on private businesses to perform functions once performed by government agencies…As governments rely on private enterprise, public property decreases in favor of privately owned property. It becomes harder and harder for citizens to find means to communicate with other citizens. Only the wealthy may find effective communication possible unless we adhere to Marsh v. Alabama and continue to hold that the more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." <u>Lloyd Corporation Ltd v. Tanner</u> 407 US  551, 586 (1972) (Marshall, J., dissenting) (internal citations and quotations omitted) (5-4 decision).

<u>Lloyd</u> held that the First Amendment did not allow Vietnam War protestors to distribute their literature within the Lloyd Shopping Center and is most often interpreted as not permitting access to a mall for First Amendment activity independently of state law allowing for such. <u>See also</u> <u>Pruneyard Shopping Ctr. v. Robins,</u> 447 U.S. 74 (1980) (holding that states may permit speech activities on private shopping centers open to public use).

Since <u>Lloyd</u> was decided in 1972, the dissent's prediction concerning the future has proved a reality. Public property has decreased even more in favor of privately owned property. Society has become more insular in character.  Private parking lots are often found between the public street and the destination of vehicle occupants. "[M]ost citizens travel by automobile, and parks all too often become locales for crime rather than social intercourse." <u>Internal Soc. for Krishna Consciousness v. Lee</u>, 505 U.S. 672, 697-698 (1992) (Kennedy, J., concurring). Gated communities and gated apartment complexes are becoming more common.

As malls certainly serve as natural conduits to meet and converse with other citizens, not being able to use them for expressive purposes undoubtedly makes it more challenging to

effectively communicate with other people living in our democracy. Alternative channels of communication to reach an audience of folks going to a shopping mall, and in some cases, an audience in general, are often absent.

But a library is not a mall. The public East Hills Library ("the Library") itself as well as the sidewalk to the front, right and left of the statue; the paved parking area surrounding the Library and the paved vehicular right-of-way that is the only access point to the Library are used for public purposes. The government, which is comprised of citizens like Plaintiff, may not deny its citizens of the freedom of speech guaranteed in the United States Constitution by hiding behind a private title. "The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances." Hague v. CIO, 307 U.S. 496, 513 (1939). As the cases below will demonstrate, when private property is not used for private purposes only, or is dedicated to public use, that property is explicitly subject to First Amendment analysis.

Marsh v. Alabama, 326 U.S. 501 (1946), the predecessor of Lloyd, involved a company town in which the streets and sidewalks were all privately owned. The Court vacated a trespassing conviction of a Jehovah's witness who was prosecuted for leafleting on the privately-owned sidewalk. Marsh was never overruled—but it was narrowed to uncover a somewhat formalistic distinction: private property used indiscriminately for "private purposes only" and private property dedicated to public use. See Lloyd, 407 U.S. at 567 (explaining that "the First and Fourteenth Amendments safeguard the rights of free speech and assembly by limitations on *state* action, not on action by the owner of private property **used nondiscriminatory for private purposes only**.") (first emphasis in original, second emphasis added). Justice O'Connor, writing for the plurality in Cornelius specifically applied this sentiment to forum analysis noting that, "a

speaker must seek access to public property **or** to **private property dedicated to public use** to evoke *First Amendment* concerns." <u>Cornelius v. NAACP Legal Defense & Educ. Fund</u>, 472 U.S. 799, 579 (1985) (emphasis added).

Circuit courts have since considered private property connected to and/or indistinguishable from public property the subject of First Amendment analysis and protection. <u>See</u> <u>Venetian Casino v. Local Joint Exec. Bd.,</u> 257 F.3d 937 (9th Cir. 2001), *cert. denied*, 535 U.S. 905 (2002); <u>United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland, Inc.,</u> 383 F.3d 449 (6th Cir. 2004); <u>First Unitarian Church of Salt Lake City v. Salt Lake City Corp.,</u> 308 F.3d 1114 (10th Cir. 2002); <u>Freedom from Religion Found. v. City of Marshfield,</u> 203 F.3d 487 (7th Cir. 2000) (abrogated on other grounds).[1]

As the exterior grounds of the East Hills Library contain a physically indistinguishable mesh of *both* public property and private property dedicated to public use (the same public use as the public property), the First Amendment governs Count I. The first picture shows the Library from the front: note that the sidewalk in front of and beside the statue garden is *not* by any means physically distinguishable from the rest of the sidewalk, nor is the library parking lot physically distinguished from the rest of the library grounds. Consequently, no reasonable person would be put on notice that they had somehow stepped into a special private enclave. Also note that the areas of private property are indeed *not* private enclaves serving private purposes only, but public areas serving public purposes—the exact same public purposes as the indistinguishable public property they are connected to. In fact, the plaque on the statue, which reads "Girl with

---

[1] Two of these cases involved a change in title from public property to private property. <u>Freedom from Religion Foundation</u> involved the transfer of the title of an area of a public park displaying a statue; <u>First Unitarian Church of Salt Lake City</u> involved the transfer of publicly owned perimeter sidewalks to private ownership with a corresponding pedestrian easement. In <u>Venetian Casino</u>, the location of the physical property in question—the perimeter sidewalks of the Las Vegas Strip abutting the Venetian—shifted, with a corresponding shift in title, after the publicly owned perimeter sidewalks were destroyed. In <u>United Church of Christ</u> there was no shift in title.

Dove/ Artist Tom Corbin/ **Generously donated to the /St Joseph Public Library**...” (emphasis added) would point any reasonable person to the conclusion that the statue is, in fact, part of the library grounds.



*“If individuals are left to guess whether they have crossed some invisible line between a public and non-public forum, and if that line divides two worlds– one in which they are free to engage in free speech, and another in which they can be held criminally liable for that speech – then there can be no doubt that some will be less likely to pursue their constitutional rights, even in the world where their speech would be protected.” Brister v Faulkner 214 F.3d 675, 682 (5th Cir. 2000).*

But, of course, the fact that Plaintiff has the right to evoke First Amendment concerns merely begins the argument, as “protected speech is not equally permissible in all places and at all times.” <u>Cornelius</u>, 473 U.S. at 578. The next step is determining whether or not First Amendment protections apply in Plaintiff’s specific situation.

**B.      FIRST AMENDMENT PROTECTIONS PRESENT PRACTICALITY QUESTIONS AND WHEN VIEWED THROUGH “FORUM ANALYSIS” ALSO PRESENT UNIQUE INTERPRETIVE CHALLENGES, NAMELY A LACK OF COHESION AND CONSENSUS REGARDING THE CONTENT AND SIGNIFICANCE OF THE CATEGORIES. THIS PRESENTS MULTIPLE PATHS TO FIRST AMENDMENT PROTECTION AND LENGTHENS BRIEFS.**

In 1897, the Supreme Court had likened the government’s ability to absolutely or conditionally prohibit speaking on public grounds to a private homeowner prohibiting it in his house. <u>Davis v. Massachusetts</u>, 167 U.S. 43 (1897). In 1939, however, the Court changed its

mind:

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for the purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient time, been a part of the privileges, immunities, rights and liberties of citizens." <u>Hague v. CIO</u>, 307 U.S. 496, 515 (1939).

Given this understanding, courts have since responded to challenges from people claiming that their rights to assemble, communicate thoughts, and discuss public questions in public places have been violated. In 1963, the Court reversed the convictions of civil rights leaders who had peacefully assembled on the grounds of the South Carolina State House. <u>Edwards v. South Carolina</u>, 372, U.S. 229 (1963).  In 1965 the Court reversed the conviction of a civil rights leader after he organized a protest on a sidewalk.  <u>Cox v. Louisiana</u>, 379 U.S. 536 (1965). In 1966 the Court overturned the convictions of those who had engaged in a peaceful sit-in at a segregated public library. <u>Brown v. Louisiana</u>, 383 U.S. 131 (1966).  In 1983 the Court protected the right of Mary Grace to hold up a sign featuring the First Amendment on the sidewalk in front of the Supreme Court without fear of arrest. <u>United States v. Grace</u>, 461 U.S. 171 (1983).

That stated, the Court, in <u>Adderley v. Florida,</u> 385 U.S. 39, 47 (1966),  has also said that the "government, no less than a private owner of property, has the power to preserve the property under its control for the use to which it is properly dedicated" and has expressly rejected the premise that "people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please." <u>Id.</u> at 48.

When presented with a question of the application of the First Amendment in a particular situation, the Court must make a determination. This determination involves not a choice between the dictum of <u>Adderley</u> and <u>Hague,</u> but rather a reconciliation between them. Their reconciliation involves not different philosophies, but a problem of practicality, for example the

difference between a student protesting in the middle of an in-session college classroom and protesting outside of a student union building. While the former certainly impedes the normal functioning of a University, the latter does not. "[T]he question in a particular case is whether that [government] control is exerted so as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places" Cox v. New Hampshire 312 U.S. 569, 574 (1941). In the service of answering this question, the Court, in Perry Educ. Ass'n v. Perry Local Educators' Ass'n 460 U.S. 37, 44 (1983) announced that "the existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue," and in so doing gave birth to "forum analysis."

> Generally speaking, our cases recognize three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums. In a traditional public forum—parks, streets, sidewalks, and the like—the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited. The same standards apply in designated public forums—spaces that have "not traditionally been regarded as a public forum" but which the government has "intentionally opened up for that purpose." In a nonpublic forum, on the other hand—a space that "is not by tradition or designation a forum for public communication"—the government has much more flexibility to craft rules limiting speech. The government may reserve such a forum "for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Minn. Voters All. v. Mansky, 138 S. Ct. 1876, 1885 (2018) (internal citations omitted).

Plaintiff's understanding of her task is that she must simplify matters for the Court, but at the same time, Plaintiff respectfully asserts that she spent months mulling over forum analysis, and the method of analysis upon which our First Amendment rights in public places depend is anything but simple. It is a mess. "See, e.g., Suzanne Stone Montgomery, Note, When the Klan Adopts-a-Highway: The Weaknesses of the Public Forum Doctrine Exposed, 77 Wash. U. L.Q.

557, 558 (1999) ('[F]our different federal courts, confronted with three substantially similar programs, approached the public forum doctrine in five different ways ... [and] reached three different decisions regarding the type of forum at issue.')." ACLU of Nevada v. City of Las Vegas, 333 F.3d 1092, 1100 (9th Cir. 2003). Indeed, "forum analysis," presents a confusion and an overall lack of cohesiveness concerning the number and names of the categories, as well as a lack of consensus and cohesion regarding their content and significance. This confusion is not confined to pro se litigants. Federal courts, Justices, and Judges have observed the following:

> [T]he Court must now characterize the forum. This is easier said than done…There are…major problems with forum analysis…The first is that it is unclear what categories of fora even exist. NAACP v. City of Philadelphia, 39 F. Supp. 3d 611, 618 (E.D. Pa. 2014).

> [O]ur Circuit's analysis of what constitutes a "designated public forum," like our sister Circuits', is far from lucid. Substantial confusion exists regarding what distinction, if any, exists between a "designated public forum" and a "limited public forum." As the First Circuit pointed out in a footnote… [t]he phrase 'limited public forum' has been used in different ways. The First Circuit accurately states that the phrase has been used as a synonym for the term "designated public forum" and also for the phrase "nonpublic forum." The Second Circuit has articulated the view that the phrases "designated public forum" and "limited public forum" are not synonyms. Bowman v. White, 444 F.3d 967, 975 (8th Cir. 2006) (internal citations and quotations omitted).

> No clear-cut test has emerged for determining when a traditional public forum exists. In the absence of any widespread agreement upon how to determine the nature of a forum, courts consider a jumble of overlapping factors, frequently deeming a factor dispositive or ignoring it without reasoned explanation. Consequently, courts do not always agree on the goals and proper application of analysis. American Civil Liberties Union of Nevada, 333 F.3d 1092, 1099-1100 (9th Cir. 2003).

> The Supreme Court has recently stated that a traditional public forum status does not "extend beyond its historic confines…." The Court has never precisely stated what those confines are, however. For instance, the Court has never defined the terms "street," "sidewalk," or "park." Nor has the Court strictly limited the traditional public forum category to streets, sidewalks, and parks. Warren v. Fairfax County, 196 F.3d 186, 192 (4th Cir. 1999) (internal citations omitted).

> I have questioned whether public forum analysis, as the Court has employed it in recent cases, serves to obfuscate rather than clarify the issues at hand…Indeed, the Court's contemporary use of the public forum doctrine has been roundly criticized by

commentators. <u>United States v. Kokinda</u>, 47 U.S. 720, 591 (1990) (Brennan, J., dissenting).

There's been a lot of criticism of it [forum analysis], and there certainly is -- are suggestions in some of the briefs in this case that we should get off that tack and onto something else in these cases. Sandra Day O'Connor. Transcript of Oral Argument, <u>United States v. Kokinda,</u> 497 U.S. 720 (1990).

It's a free country. And when you're talking about what people can say, what signs they can put up, what they can do, I think people as a general matter need to appreciate that it's a free country and it's a wonderful thing that people can say things in the public that you may not agree with, because you, of course, have the same right. Now, the particular mode of analysis that the Supreme Court uses in addressing these types of public speech issues is to some extent unsettled. Public forum doctrine, as it's called, for many years, you tried to characterize an issue: Is this a public forum, is it a quasi-public forum, is it a private forum? And the definition sort of carried with it the conclusion about what could be allowed. And many of the justices thought that the reasoning was awfully circular. John Roberts. <u>Second Day of Hearings on the Nomination of Judge Roberts</u>, The New York Times, (Sept.13, 2005), www.nytimes.com/2005/09/13/politics/politicsspecial1/second-day-of-hearings-on-the-nomination-of-judge.html.

The particulars of forum analysis are, indeed, unsettled, and, when taken independently of the substantive right that guides them, can become trapped in formalism, allowing for a tension between the different philosophies of access to public places in <u>Hague</u> and <u>Davies</u> to coexist, on the surface, indistinguishably alongside forum analysis. Below the surface, however, logic makes it resoundingly clear that there are interpretations of forum analysis that premise that the substantive acknowledgement and application of the First Amendment to the United States Constitution is an "essay[]…that…should be avoided," <u>Hague</u>, 307 U.S. at 531 (McReynolds, J. dissenting). Such interpretations have the practical effect of deconstructing First Amendment rights, and contain one or more of the following characteristics:  thinly veiled circular logic, conflation of the categories and/or deference to the government's stated intent. Separating forum analysis from the ends that it serves is irreconcilable with case law: "[I]mperative is the need to preserve inviolate the constitutional rights of free speech, free press,

and free assembly in order to maintain the opportunity for free political discussion, to the end

that government may be responsive to the people, and that changes, if desired, may be obtained

by peaceful means." <u>De Jonge v. Oregon</u>, 229 U.S. 353, 365 (1937). On one level, this

memorandum argues that the right to petition in front of a public library remains intact, even

when examined through formalistic interpretations of "forum analysis" that attempt to suffocate

any meaningful application of the First Amendment.  On another level, this memorandum is a

plea and prayer, supported and bolstered by recent Supreme Court guidance, that this Court

would give no moment to circular logic, category conflation, or deference to the government's

stated intent; that the aforementioned interpretive possibilities be eradicated from the pool of

dispositive factors to choose from when determining a category and/or determining whether or

not a restriction is reasonable/compelling/significant;  and that road to vindicate Plaintiff's civil

rights run through more than this one sidewalk and the external grounds of  this one library in St.

Joseph, Missouri.

**C.      THE ABILITY TO PETITION ON THE EXTERNAL GROUNDS OF A PUBLIC
         LIBRARY SURVIVES A REASONABLENESS REVIEW.**

"Reasonableness" is the standard the courts use to evaluate speech restrictions in fora that

are sometimes referred to as nonpublic. <u>Cornelius</u>, 473 U.S. at 809. And while cases absolutely

say that a regulation in nonpublic fora "need only be reasonable; it need not be the most

reasonable or the only reasonable limitation," <u>Id.</u> at 584, the question of the *definition* of

"reasonable" logically precedes questions of its degree. Hence, the argument that the government

can regulate speech in any way it likes due to infinite degrees of "reasonableness" crumbles for

lack of definitional foundation: the categorization of a forum  as nonpublic  "does not mean that

the government can restrict speech in whatever way it likes." <u>International Soc. for Krishna</u>

<u>Consciousness (ISKCON) v. Lee</u>, 482 U.S. 640, 687 (O'Connor, J., concurring on the narrowest

grounds). "[A] restriction on speech in a nonpublic forum is 'reasonable' when it is 'consistent with the [government's] legitimate interest in 'preserving the property . . . for the use to which it is lawfully dedicated'" Id., at 688 (O'Connor, J., concurring) (internal citations omitted) (first bracket added, second bracket in original). This consistency, or lack thereof, is assessed "in light of the purpose of the forum and all the surrounding circumstances" Cornelius, 473 U.S. at 809.

As stated above, the right of citizens to discuss public questions and the right of the government to preserve its property for the purposes to which it has been dedicated are not mutually exclusive. Surely there *are* policies that a library can and should enact to preserve the property for the purpose to which it is dedicated. If someone brings potent foul-smelling articles into the library, this may impinge on other patrons' ability to enjoy the library. See Lu. v. Hulme 113 F. Supp. 3d 312 (D. Mass. 2015) (holding that preventing the plaintiff in the case from bringing his foul-smelling cart into the library was not a violation of his First Amendment rights). Had someone gone on loudly about the end of times while Plaintiff was researching and writing inside of the law library, that would have reasonably impinged on her ability to focus on writing her complaint.

But citizens peacefully petitioning and discussing public questions with people who they share a democracy with *on the exterior grounds* of a public library—in a way that does not impede ingress or egress—in no way precludes one's ability to use the library for its intended purpose. This rings of "common sense" and surfaces an important distinction: the distinction between a state's interest in preserving a property for the purposes to which it has been dedicated and a state's "interest" in *undifferentiated paternalism.* In fact, *undifferentiated paternalism* is comprised of phenomena that the Supreme Court has explicitly *rejected* as grounds of censorship of speech: "public inconvenience, annoyance, or unrest," Terminiello v. City of Chicago, 337

U.S. 1, 4 (1949) and/or "undifferentiated fear or apprehension of disturbance." Grayned v. City of Rockford, 408 U.S. 104, 117 (1972). These phenomena, unrelated to preserving a property for its dedicated use, are insufficient to "overcome the right to free expression." Id. at 117.

Unlike places where the general public cannot physically walk (e.g. teacher's mailboxes in the workplace (see Perry)), folks' personal mailboxes (see United States Postal Service v Council of Greenburgh Civic Assns. 453 U.S. 114 (1981)), and utility poles (see Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 798 (1983)), phenomena of dubious spatiality in general (like a fundraising campaign (see Cornelius,)) or advertising platforms (see Lehman v. City of Shaker Heights 418 U.S. 298 (1974)), restrictions/prohibitions of speech that serve the sole purpose of *undifferentiated paternalism* are most common in open, external areas where citizens frequently encounter other citizens.[2] The ability to conceptualize this phenomenon is especially amplified on external grounds of public buildings that offer unrestricted access and invite people to linger, like the multi-purpose sidewalk at issue here. In this case the forum that Plaintiff seeks access to (see Cornelius, 473 U.S. at 801 (defining the relevant forum as the place of "access sought by the speaker")) is the *external grounds* of a public library. While folks talking in normal decibels amongst themselves about their children, the quality of the service at a restaurant they ate at, their new boyfriend, or their new car would likely prove distracting to a library patron reading any book inside of the library, this same conversation on the exterior grounds of a public library distracts nobody from anything. It is an appropriate place for people to talk to each other, to interact with each other, to compliment a stranger on something they are wearing or ask for the time or the weather, to ask another parent what type of formula they use or what types of books their toddler enjoys, to talk with another parent about what their child chose

---

[2] These open, external spaces often bear objective and/or nominal likenesses to places that the Supreme Court has characterized as traditional public fora.

to write or draw on a rock that they put in the garden, or even to have a conversation about a book they just read or what candidate has the best position on elementary education. It is also an appropriate place for citizens to ask citizens who they share a democracy with to sign a petition, and this basic human interaction in itself is only distinguished from other types of human interaction by its content—*it is political*—and is in no way incompatible with the normal activity of the place or precludes the preservation of a library for the purposes it has been dedicated.

"[A] trio of Supreme Court opinions, all written by Justice O'Connor, demonstrate[ ] that there are two ways... [it can be shown that restrictions are reasonable]: record evidence or commonsense inferences" <u>NAACP v. City of Philadelphia</u>,  834 F.3d 435, 444 (3rd Cir. 2016).[3] Neither common sense inferences nor evidence on the record work in Defendants' favor. The library has produced no substantive evidence that petitioning on its external grounds precludes its intended function. Moreover, should common sense inferences be determinative in favor of speech in any location, they are determinative here: the external grounds of the library—a place that is a "forum[ ] for information and ideas" <u>Intellectual Freedom Policies. Library Bill of Rights.</u> St. Joseph Public Library, <u>https://sjpl.lib.mo.us/policies/intellectual-freedom-policies/-</u>- are an open, public area that invite people to linger and chat outside of a building in which one can read about whatever idea they would like.  Indeed, the area in which Plaintiff was arrested is the epitome of a place that promotes a free exchange of ideas and petitioning here is profoundly compatible with a library's purpose and is at the heart of what the First Amendment is supposed to protect.

---

[3] <u>NAACP v. City of Philadelphia</u> 834 F.3d 435 (3rd Cir. 2016) walks through three cases--<u>Cornelius</u>, <u>Kokinda</u>, and <u>Lee</u>--and explains how the showing is demonstrated in each of them. Here the Third Circuit also determined that the burden of showing that a policy is reasonable must be met by the government.

While peacefully petitioning on the external grounds of a library is unquestionably allowed under the reasonableness criteria from a holistic standpoint, the current state of case law perhaps requires that one part of the whole be addressed with particularity: the specific activity in question (petitioning). In <u>Lee</u>, the Supreme Court concluded that the inside of an airport terminal[4] was a nonpublic forum and that a ban on the distribution of literature there should be struck down, while a ban on fundraising was allowed to stand. 505 U.S. 672 (1992). This decision to a certain degree echoed a previous decision, <u>United States v. Kokinda,</u> 497 U.S. 720 (1990). In <u>Kokinda</u>, while a majority of justices did not agree upon the classification of the forum in question—a non-perimeter sidewalk on the external grounds of a post office—the four Justices who concluded the area to be a non-public forum stated that "it is not unreasonable to prohibit solicitation on the ground that it is unquestionably a particular form of speech that is disruptive of business" and further elaborated that "[t]he individual solicited must decide whether or not to contribute (which itself might involve reading the solicitor's literature or hearing his pitch), and then, having decided to do so, reach for a wallet, search it for money, write a check, or produce a credit card." While petitioning certainly does not involve reaching into a wallet, searching it for money, writing a check or producing a credit card, we do lack direct guidance from the Supreme Court regarding this specific activity in a nonpublic forum.[5]

Plaintiff has worked as both a petitioner and a fundraiser. She likes petitioning much

---

[4] Noting that, while substantive distinctions regarding congestion and purpose exist between the airport terminal and the forum at issue in Plaintiff's case, Plaintiff is addressing the expressive activity of petitioning here specifically in order to leave stone unturned.

[5] District Court opinions reflect this lack of explicit guidance. <u>See</u> <u>Wickersham v. City of Columbia, MO</u>, 371 F.Supp.2d 1061, 1089 (W.D. MO, 2005) (assuming without discussion that petitioning and solicitation should be categorized similarly). <u>C.f.</u> <u>Jews for Jesus, Inc. v. Massachusetts Bay Transp. Authority,</u> 984 F.2d 1319 (1st Cir. 1993) (concluding that the peaceful solicitation of signatures, like leafletting, was allowed in the nonpublic forum in question).

better. Fundraising often requires multiple asks, establishing trustworthiness to receive financial information, and rebuttals—resulting in interactions that can sometimes resemble haggling and longer amounts of time spent with each person. Petitioning is a different interaction all-together. Everyone who is a registered voter in the applicable area can sign, and folks need not contribute or have money to make a difference in this way. More people get involved, and some have even been waiting to run into someone circulating a given petition. Moreover, nothing that resembles haggling is necessary to be successful; if someone cannot sign or does not want to sign, the best course of action is to politely end the conversation with them and begin a conversation with another individual. While Plaintiff makes no judgment regarding any disruption that may or may not be caused by fundraising, any such characteristics of fundraising that may be interpreted as disruptive are notably absent from petitioning. Even the government, while arguing that soliciting for the immediate payment of money on a non-perimeter sidewalk in front of a post office was not protected activity, acknowledged this fact:

> [T]he Postal Service had not found any problem with it [petitioning] on postal premises. There are people who want to leaflet on postal premises, who want to picket and who want to seek signatures for petitions. It's when you let them ask for money that the crowds come out and the problems are experienced. Transcript of Oral Argument at 6, <u>United States v. Kokinda</u>, 497 U.S. 720 (1990).

Moreover, the Court has recently lumped one-on-one communication (for which petitioning was an example) together *with* leafleting as a "form of expression" that has "historically been more closely associated with the transmission of ideas than others." <u>McCullen v. Coakley,</u> 134 S. Ct. 2518, 2536 (2014). And finally, petitioning is simply *not* solicitation for an immediate act of charity, it is "the most effective, fundamental…..avenue of political discourse, direct one-on-one communication"—an area in which the Supreme Court has stated that "the importance of First Amendment protections is at its zenith." <u>Meyer v. Grant</u>, 486 U.S. 414, 424-25 (1988) (internal

quotations omitted).


**D.      STRICT SCRUTINY APPLIES ANYWAY.**

**1.   The Sidewalk in Front of the East Hills Library and Others Like it are Traditional Public Fora.**


> "[P]ublically owned streets, sidewalks, and parks are so historically
> associated with the exercise of First Amendment rights that access to them
> for the purposes of exercising such rights cannot be denied absolutely." Lloyd v. Tanner,
> 407 US 551, 559 (1972).

> "Public places," such as streets, sidewalks, and parks, historically associated with the free
> exercise of expressive activity are considered, without more, to be "public forums."
> United States v. Grace, 461 U.S. 171, 177 (1983).

> "[T]ime out of mind public streets and sidewalks have been used for public assembly and
> debate, the hallmarks of a traditional public forum." Frisby v. Schultz, 487 U.S. 474, 480
> (1988) (internal quotations and citations omitted).


United States v. Kokinda, 497 U.S. 720 (1990),  a case which upheld an in-person direct

solicitation of money restriction on a non-perimeter sidewalk adjacent to a post office,  in no way

precludes the traditional public forum classification of the sidewalk in front of the East Hills

Library. One misinterpretation of Kokinda that seems to be common is that the Supreme Court

found that the "single purpose" sidewalk in front of the post office was a nonpublic forum. In

actuality they found nothing of the sort: only four of nine justices theorized that the non-

perimeter postal sidewalk was not a public forum, while four justices theorized that it *was* a

public forum: "[i]t is only common sense that a public sidewalk adjacent to a public building to

which citizens are freely admitted is a natural location for speech to occur" Id. at 742 (Brennan,

J., dissenting).  "Thus, the Kokinda plurality opinion was unable to garner a majority of votes to

follow its proposed departure from the Court's historical analysis that public sidewalks are

essentially always public for a," Supplemental Brief in Support for a Temporary Restraining

Order at 2, <u>Groene v. Seng</u>, No. 06-cv-3153, 2006, WL 5680261 (D. Neb. June 29, 2006). Moreover, apart from being an open public place, the sidewalk in front of the East Hills Library is *both* functionally and objectively distinct from the Kokinda Sidewalk.

Those who come to the East Hills Library come not by necessity, but choice (Cf. with post offices: "[m]any of those who use postal facilities do so from necessity, not choice" <u>United States v. Kokinda</u> 497 U.S. at 737 (Kennedy, J. concurring)), and libraries are "forums for information and ideas" <u>Intellectual Freedom Policies. Library Bill of Rights</u>, St. Joseph Public Library, *supra*, not businesses. Unlike the post office sidewalk in <u>Kokinda</u>, which at least half of the Supreme Court determined to be a traditional public forum, the sidewalk in front of the East Hills Library serves not the single purpose of "provid[ing] for the passage of individuals engaged in ["library business"]" <u>United States v. Kokinda,</u> 497 at 727, but multiple purposes. There is a rock garden with somewhat of a circular landscape and a statue in the middle. There was a sign present in the rock garden when Plaintiff was arrested and when Plaintiff returned to the scene on January 2, 2019. The sign read: "Take a rock for inspiration/ Share one for motivation/ Leave a rock to help the garden grow." There are benches intertwined with the circular, welcoming landscaping. Circular detours do not aid in the negotiation of space, and furthermore the benches, statue, and rock garden that explicitly invites people to interact with the landscaping empirically foreclose the possibility that the sidewalk in front of the East Hills Library "was constructed solely to assist…..patrons to negotiate the space between the parking lot and the front door" <u>Id.</u> at 728 of the Library.

The sidewalk adjacent to the East Hills Library, which was certainly uncongested every time that Plaintiff was there, is "a place where people may enjoy the open air or the company of friends and neighbors" <u>Heffron v. International Society for Krishna Consciousness, Inc.</u>, 452

U.S. 640, 651 (1981). <u>See</u> <u>United States v. Kokinda</u>, 497 at 727 (four Justices using the absence of this criteria to support their theory that the postal sidewalk should not be classified as a public forum). <u>See also</u> <u>Lederman v. United States</u>, 291 F.3d 36, 44 (DC Cir. 2002) (using this same criteria to distinguish a non-perimeter sidewalk, which was ultimately classified as a public forum, from the postal sidewalk) and <u>Prigmore v. City of Redding</u>, 211 Cal. App. 4th 1322, 1340 (2012) (same).

Finally, although Justice Kennedy, in his narrowest-grounds <u>Kokinda</u> concurrence, did not explicitly classify the postal sidewalk as a public forum, we are not left to pure conjecture concerning his view, as there are plenty of clues to be found:

<u>Clue #1</u>**:** Kennedy used the test for a traditional public forum—not the test for reasonableness—to determine that the prohibition in question did not offend the First Amendment. His conclusion was that a prohibition of *one specific type* of expressive activity—"personal solicitations for the immediate payment of money" <u>United States v. Kokinda</u>, 497 U.S. at 738 (Kennedy, J., concurring)—survived strict scrutiny, a conclusion that Kennedy pointed out was consistent with other solicitation bans in public fora. <u>Id.</u> at 737-39 (Kennedy, J., concurring)

<u>Clue #2</u>**:** Kennedy told us explicitly that there was a "powerful argument" that the sidewalk in question was "more than nonpublic fora." <u>Id</u>. at 737 (Kennedy, J., concurring).

<u>Clue #3</u>: Kennedy evoked the importance of "objective characteristics" <u>Id.</u> at 737 in forum analysis in <u>Kokinda</u>, and furthermore he re-referenced this exact quotation—"if our public forum jurisprudence is to retain vitality, we must recognize that certain objective characteristics of Government property and its use by the public may control the analysis"—and elaborated upon it two years later in <u>Lee</u>, 505 U.S. at 693 (Kennedy, J., concurring). In Kennedy's explicit elaboration, he added that "the policies underlying the doctrine cannot be given effect unless we recognize that open, public spaces and thoroughfares that are suitable for discourse may be public forums, whatever their historical pedigree and without concern for a precise classification of the property." <u>Id.</u> at 697. The sidewalk in front of the East Hills Library is both an open, public space <u>and</u> has the objective characteristic of being a sidewalk. Hence, not only is it one of the undifferentiated "public places" that Kennedy pointed out enjoys precedential support for the exercise of free speech activities <u>Id.</u> at 697, but also is one of the specific, differentiated categories—a sidewalk—that the Supreme Court has repeatedly classified as a public forum.

<u>Clue #4:</u> Kennedy's writing indicates a profound commitment to purpose underlying the First Amendment, and to the preservation of that purpose in a society that is becoming, in his words, "more insular in character." <u>United States v. Kokinda</u>, 497 U.S. at 737 (Kennedy, J., concurring). "The right of speech...comes not from a Supreme Court dictum but from the constitutional recognition that the government cannot impose silence on a free people." <u>ISKCON v. Lee</u>, 505 U.S. at 562 (Kennedy, J., concurring). "The liberties protected by our doctrine derive from the Assembly, as well as the Speech and Press Clauses of the *First Amendment*, and are essential to a functioning democracy...Public places are of necessity the locus for discussion of public issues, as well as protest against arbitrary government action. At the heart of our jurisprudence lies the principle that in a free nation citizens must have the right to gather and speak with other persons in public places." <u>Id.</u> at 561.

Another district court inside the Eighth Circuit specifically considered the forum status of publicly and privately owned sidewalks adjacent to public buildings—including libraries—and determined that they were "likely public fora," granting a temporary restraining order to plaintiff petition circulators. <u>Groene v. Seng</u>, No. 06-cv-3153, 2006, WL 5680261 (D. Neb. June 29, 2006).

And if the Court still has any doubts concerning the forum status of this sidewalk, recent Supreme Court decisions provide interpretive guidance for situations just like this one: "First Amendment standards…must give the benefit of any doubt to protecting rather than stifling speech." <u>Citizens United v. Fed. Election Comm'n</u>, 558 U.S. 310, 327 (2010) (internal citations and quotations omitted). "Where the First Amendment is implicated, **the tie goes to the speaker, not the censor.**" <u>Fed. Election Comm'n v. Wis. Right to Life, Inc. (WRTL)</u>, 551 U.S. 449, 474 (2007) (emphasis added). The sidewalk in front of the East Hills Library and others like it are traditional public fora.

## 2. The External Grounds of a Public Library are Traditional—or Designated—Public Fora.

We find ourselves in moments between birth and death. The context is social, or public, in which we encounter other people who find themselves in those same moments. We have a

survival problem that we must attend to, and to that end we seek access to resources, and we find ourselves sometimes cooperating and sometimes competing with other people for access to those resources. Our actions in this public context have ramifications upon others—notable examples in our recent history include slavery and child labor, as well as the abolitions thereof. It is by discussing "public questions" that we talk to each other about how we could/should encounter and treat each other during these moments, how to make the most of them, and what they mean. The suggestion that our government has a high burden in justifying speech restrictions is a product of human history and made its first appearance in the United States Constitution, Amendment #1: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

The freedom of speech—a "basic American approach" that is "captured in the expression" Second Day of Hearings on the Nomination of Judge Roberts, *supra*—serves not only to protect our ability to discuss public questions with each other for its own sake, but also to *protect* and *preserve* our democratic institutions. "The First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Meyer v. Grant, 486 U.S. 414, 421 (1988) (internal quotations and citations omitted). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." Citizens United, 558 U.S. at 339. "The vitality of civil and political institutions in our society depends on free discussion...it is only through free debate and **free exchange of ideas** that government remains responsive to the will of the people and peaceful change is effected."

<u>Terminiello v. Chicago</u>, 337, U.S. 1, 4 (1949) (emphasis added).

 While not mentioned in <u>Perry</u>, the case which unveiled the system of "forum analysis," an unsettled association between a "free exchange of ideas" and the content of a forum category first makes an appearance in a subsequent case, <u>Cornelius</u>: "[A] principle purpose of a public forum is the free exchange of ideas." 473 U.S. at 800. This idea resurfaced in <u>Lee</u>, 452 U.S. 640 (1981). In this case, five justices came to an agreement that airport terminals were not public fora.[6] One of the reasons elaborated upon for this is that an airport terminal does not have "a principle purpose of promoting 'the free exchange of ideas'" <u>Id.</u> at 682 (internal citations omitted).

 Left unanswered and unsettled in this free-exchange-of-ideas public forum "conceptualization" in <u>Lee</u> is what, if any, criteria demonstrate that a property has a "free exchange of ideas" as a principle purpose, who makes this decision, and to what extent, if any, does a "principle purpose of a free exchange of ideas" interrelate with other purposes of the forum. Historical precedent provides unshakeable foundation for the idea that "free exchange of ideas" is essential to a functioning democracy, and that this foundation is guaranteed to people in this democracy by virtue of the First Amendment; property thus has a "free exchange of ideas" as a principle purpose by virtue of being compatible with First Amendment activity. <u>See</u> <u>Grayned v. City of Rockford</u> 408 U.S. at 116 ("The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time."). What the government may not do is depart from previously established precedent, disregard the role of the First Amendment to a functioning democracy, and argue that compatibility is not applicable. Characteristic of this departure is the notion that the *stated*

---

[6] They did not, however, reach an agreement that First Amendment activities could be restricted in any way the government wanted. See Justice O'Connor's concurrence.

*purpose* of a property is wholly or partially dispositive of a property's forum classification. This interpretation makes a mockery of both democracy and the First Amendment by striking at the heart, turning the "free exchange of ideas" that is essential to protecting and preserving our democratic institutions into a formalistic weapon of definition that abridges (and threatens to annihilate) the freedom of speech. It is an interpretation that carries with it the premise that government officials must, at their discretion, designate a place specifically for the free exchange of ideas as a precondition for First Amendment protections—an interpretation that conflates the category of the traditional public forum with a designated public forum and employs circular logic to effectively collapse the category of a traditional public forum altogether, subsequently obliterating "one of the chief distinctions that sets up apart from totalitarian regimes." Terminiello v. Chicago, 337 U.S. at 4. The *stated purpose interpretation,* which cannot be made in good faith, has been subject to negative—but undeniably truthful—commentaries, not only as applied to the undifferentiated "public places" that the Supreme Court has repeatedly assumed are protected by the First Amendment, but also as applied to streets, sidewalks and parks— traditional public forum content that the Court has disclosed nominally. "It would seem apparent that the principal purpose of streets and sidewalks, like airports, is to facilitate transportation, not public discourse, and we have recognized as much… ["Municipal authorities, as trustees for the public, have the duty to keep their communities' streets open and available for movement of people and property, **the primary purpose to which the streets are dedicated**." Schneider v. State, 308 U.S. at 160 (emphasis added)] Similarly, the purpose for the creation of public parks may be as much for beauty and open space as for discourse."[7] Lee, 505 U.S. at 696-97 (Kennedy,

---

[7] Justice Brennan, speaking for half of the Supreme Court in Kokinda, made a similar observation, commenting that parks, streets, and sidewalks, far from being constructed as philosophical magic-lands to promote expressive activity and idea exchange, are actually constructed for other purposes:  "[p]arks are usually constructed to beautify a city and to provide opportunities for recreation, rather than to afford a forum for soapbox orators or leafleteers; streets

J., concurring). <u>See also</u> <u>Warren v. Fairfax</u>, 196 F.3d 186,195 (4th Cir. 1999) and <u>ACLU of</u>

<u>Nevada v. City of Las Vegas</u>, 333 F.3d 1092, 1102 (9th Cir. 2003) (both noting that "[o]ne cannot

seriously argue with Justice Kennedy's observation that the traditional public fora of streets,

sidewalks, and parks are not primarily designed for expressive purposes").

  While the reconciliation of the import of the "free exchange of ideas"[8] in <u>Lee</u> with other

Supreme Court precedent clearly requires a compatibility interpretation, even *after* striking the

heart of the First Amendment with the *stated purpose interpretation*, a library (unlike streets,

sidewalks, and parks) has this ideal embedded in its foundation, and is left standing: "The

American Library Association affirms that **all libraries are forums for information and**

**ideas**…..Libraries should cooperate with all persons and groups concerned with resisting

abridgement of **free expression** and free access to ideas." <u>Intellectual Freedom Policies. Library</u>

<u>Bill of Rights</u>, St. Joseph Public Library, *supra* (emphasis added).

  While federal appellate courts have indeed applied forum analysis in situations where the

access sought by the speaker was *inside* of a public library (<u>see e.g.</u> <u>Doe v. City of Albuquerque</u>

667 F.3d 1111, 1129-30 (10th Cir. 2012); <u>Kreimer v. Bureau of Police for Town of Morristown</u>

958 F.2d 1242, 1259 (3rd Cir. 1992)), courts that have considered First Amendment claims of

access to the *external* grounds of a library have taken the "more tailored approach," <u>Prigmore v.</u>

<u>City of Redding</u>, 211 Cal. App. 4th 1322, 1338  (2012) of distinguishing the exterior of a public

library from its interior. This "more tailored approach" is nothing new. <u>See</u> <u>Perry</u>, 460 U.S. at 44

(differentiating different *parts* of a school grounds in the two sentences directly preceding its

---

are built to facilitate transportation, not to enable protesters to conduct marches; and sidewalks are created with
pedestrians in mind, not solicitors." *Id.* at 744 (Brennan, J., dissenting).
[8] Note that when describing traditional public fora, the Supreme Court, in 2018, retreated from this amorphous
principal-purpose-of-a-free-exchange-of-ideas construction and referenced more objective criteria: "parks, streets,
sidewalks—and  the like" <u>Minn. Voters All. v. Mansky</u>,  138 S. Ct. 1876, 1885 (2018).

announcement of "forum analysis").

In <u>Deans v. Las Vegas Library District</u>, the federal district court classified the external plaza of the West Charleston Public Library in Las Vegas as "likely a public forum" and granted plaintiff petition circulator William Deans a preliminary injunction (and later summary judgment) such that he could petition there without paternalistic impediments like a small designated area and a check-in procedure. 200 F.Supp. 3d 1058 (D. Nev. 2016). "Characterizing the area as a public forum is consistent with the role of a library as a mighty resource in the free marketplace of ideas. It is specially dedicated to broad dissemination of ideas." <u>Id</u>. at 1063 (internal citations omitted).

**E.   THE LIBRARY POLICY IS NOT NARROWLY TAILORED AND MOREOVER FAILS TO SELECT A VERY SIMPLE, AVAILABLE ALTERNATIVE.**

The  Supreme Court has explicitly indicated that  "public inconvenience, annoyance, or unrest," <u>Terminiello v. City of Chicago</u>, 337 U.S. 1, 4 (1949) and "undifferentiated fear or apprehension of disturbance" <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 117 are insufficient to "overcome the right to free expression" <u>Id.</u>, at 117 and logic would indicate that labeling "concerns" such as these as government interests, regardless of forum classification, would effectively collapse <u>all</u> First Amendment rights.

That stated, in traditional and designated public fora, the government may enact "[c]ontent neutral time, place and manner regulations" that are "narrowly tailored to serve a significant government interest" <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989). The designated area in the library policy is not narrowly tailored to a cognizable—much less a compelling—government interest. A compelling interest of the library that Plaintiff does not dispute is ensuring the unimpeded ingress and egress of patrons. But, it is unnecessary and unreasonable to confine petitioners to a physical box in an extremely uncongested area in order

to achieve that interest, and a "substantial portion of the [Library's] burden on speech does not serve to advance its goals." <u>Ward</u>, 491 at 799-800. In sweeping within its grasp far more than is necessary to achieve any cognizable interest, the designated area places paternalistic constraints on human interaction and conversation serving a political purpose (an "othering"), but leaves intact the ability citizens to communicate with and interact with citizens for other purposes without such paternalistic constraints. The burden of the designated area on an individual's speech is significant and substantial; it hinders citizens from actively approaching other citizens and walking with citizens, both natural (and effective) strategies to talk with people about matters of public import, and even hinders a petitioner from walking with people who have requested that the petitioner answer questions regarding the content of the petition. The burden of the designated area on democracy is also substantial; political change does not happen as a result of citizens taking it upon themselves to visit the designated area of enlightenment, but instead happens because we the people take the initiative to approach other citizens and have a conversation.

In O'Connor's narrowest grounds concurrence in <u>Lee</u>, after determining that a ban on leafletting was not reasonable in the nonpublic forum at issue, she introduced the narrow tailoring of restrictions in a nonpublic forum. <u>See</u> <u>Lee</u>, 505 U.S. at 692. Likewise, upon a determination that a ban on petitioning on the exterior grounds of a public library is not reasonable, even if the forum is classified as nonpublic, any regulations on petitioning should be narrowly tailored. But, even if the content or significance of this part of O'Connor's concurrence should be interpreted differently, the designated area is still not reasonable as it fails "to select [a] simple available alternative[ ]." <u>Sammartano v. First Judicial Dist. Court</u>, 303 F.3d (9th Cir. 2002) (internal citations omitted). The simple available solution of requiring that petitioning take

place a reasonable distance from the doors need not be nonchalantly overlooked in order to confine petitioning activities to a box.

One final, but important point regarding the designated area is that its application has proven to have a chilling effect that extends beyond the restriction itself. On January 30, 2018, Plaintiff was informed of no designated area, and the events set forth in her complaint transpired. In February of 2020, Plaintiff returned to the Library to petition, and, out of fear of arrest, confined her petitioning to the designated area. Two different Library staff members told Plaintiff that she would need to petition in at least two different areas that were different than the area set forth in the actual policy. These areas were different in the sense that they were even smaller and more restrictive of movement. Given that this happened *to Plaintiff after she had filed a lawsuit challenging the validity of the policy itself,* it is not unreasonable to assume that Plaintiff and other citizens, in the absence of legal intervention, will continue to be subject to increasingly heightened degrees of paternalistic restrictions and well as threats of adverse legal action that extend beyond the Library policy itself.

**F.      THE LIBRARY POLICY IS IMPERMISSIBLY VAGUE.**

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). The current Library policy indicates that petitioners are not to "pursue patrons." While the spatial constraints of the designated area would make it difficult to follow or walk with someone for more a couple of footsteps, this "pursue patrons" construction covers over multiple distinctions: 1) petitioners should not approach patrons from behind, 2) petitioners should not follow patrons, 3) petitioners should not walk beside patrons,  4) petitioners should not follow patrons after they

have said "no," 5) petitioners should not initially actively approach patrons from any angle and 6) petitioners should not *verbally* pursue patrons, an interpretation which would render all expressive activity passive in nature. Hence, Librarian A could interpret the policy to mean that petitioners have to stand still in the designated area and not talk and wait for patrons to approach them with interest, Librarian B could interpret the policy to mean that actively approaching people from any angle and talking is fine, and Librarian C could vary his or her interpretation depending on his or her opinion about the initiative.

## G.   "FORUM ANALYSIS" IS ALSO IMPERMISSIBLY VAGUE.

Plaintiff acknowledges that articulating a method of analysis to apply the freedom of speech to particular situations is not easy. "Condemned to the use of words, we can never expect mathematical certainty from our language." Grayned v. City of Rockford, 408 U.S. 104, 110 (1972). But, respectfully, we are not condemned to pulling factors randomly and inconsistently without indicating whether some/all/some combination of those factors are dispositive of determining whether a particular place in general or a particular sidewalk is 1) a place where one enjoys First Amendment protections when discussing public questions or 2) a place where one can legally be put in pink handcuffs and carted off to jail while listening to "Another One Bites the Dust" by Queen for attempting to discuss public questions.  Nor are we condemned to continue using a "categorical"/forum method of "analysis" in which the Justices of the Supreme Court themselves cannot agree as to the content and significance of the "categories." Indeed, Plaintiff requested a determination from law enforcement *and* told law enforcement that she would not disobey an order, and not even this spared her from criminal prosecution. Incohesion has consequences; in the context of the First Amendment, the consequence is that our First Amendment rights are "blanket[ed] with uncertainty" Federal Election Com'n v. Wisconsin

Right to Life, Inc (WRTL), 551 U.S. 449, 468 (2007) (internal citations omitted) and with a chilling effect that threatens to suffocate our rights to discuss public questions with other citizens, both by ambiguity[9] and by the potential for formalistic interpretations that can confine discussing public questions to places where there are no members of the public to be found and even deconstruct the right altogether.

The need for "breathing space" is not confined to government officials who must make quick decisions when performing discretionary functions. As recently recalled by the Supreme Court, "First Amendment freedoms need breathing space to survive." Id. at 468, 469 (2007) (citing NAACP v. Button, 371 U.S. 415, 433 (1963)). Faith in an independent judiciary would indicate that recent Supreme Court decisions protecting speech reflect not a preference to certain topics or certain speakers, but rather a *remembrance* that "[u]nder our Constitution it is We The People who are sovereign. The people have the final say... It is therefore important—vitally important—that all channels of communications be open." Citizens United v. Federal Election Com'n, 558 U.S. 310, 344 (2010). A remembrance that the First Amendment is a *reflection* of *our* judgment that "the benefits of its restrictions on the Government outweigh the costs" United States v. Stevens, 559 U.S. 460, 461 (2010); a *reflection* of *our* "profound national commitment" to the principle that "debate on public issues should be uninhibited, robust, wide-

---

[9]Not even a perimeter sidewalk is safe. See Keister v. Bell, 879 F.3d 1282 (11th Cir. 2018) (affirming a district court decision which utilized the "duck test" to determine that a perimeter sidewalk was not a traditional public forum). Moreover, in Kokinda, the four justices who seemed to subscribe to a particularized inquiry theory as to which sidewalks are sidewalks proclaimed that the following features are characteristic of sidewalks that have First Amendment protection: a public passageway, a thoroughfare, "continually open," "often uncongested," constitutes a "necessary conduit in the daily affairs of a locality's citizens," "a place where people [could] enjoy the open air or the company of friends and neighbors in a relaxed environment" and a place that serves "to facilitate the daily commerce and life of a neighborhood or city." United States v. Kokinda. 497 U.S. 720, 727 (1990). They did not provide a blueprint, under their theory, for determining which public sidewalks are open to expressive activity, nor did they even indicate if a sidewalk need have all, some, or one of the characteristics they referenced above. In fact, the way the inquiry is worded, there may even be more characteristics (i.e. passing the duck test, etc.) that sidewalks must have to be sidewalks that are subject to First Amendment protection. This situation is beyond frustrating (and chilling) to citizens who are trying to communicate with other citizens about matters of public concern without being arrested and prosecuted.

open" Snyder v. Phelps, 562 U.S. 443, 452 citing New York Times Co. v. Sullivan, 376 U.S.

254, 270; a *reflection* of *our* choice "to protect even hurtful speech on public issues to ensure

that we do not stifle public debate." Snyder v. Phelps, 562 U.S. 443, 461. In a democracy, we—

all of us, including Plaintiff—have the opportunity to "persuad[e] [our] fellow citizens of the

justice of [our] cause." Obergefell v. Hodges, 135 S. Ct. 2584, 2625 (2015) (Roberts, C.J.,

dissenting). Neither the Constitution nor democracy itself permits censorship that pays lip

service to this opportunity, nor do they "permit laws that force speakers to...seek declaratory

rulings [e.g. a declaratory ruling that a sidewalk is a sidewalk] before discussing the most salient

political issues of our day," Citizens United v. Federal Election Com'n, 558 U.S. at 324, nor do

they permit the formalistic annihilation of "an uninhibited marketplace of ideas," Id. at 335

(internal citations omitted), nor do they permit special exemptions for case law—nowhere in *our*

Constitution are we only guaranteed the freedom of speech in traditional, exclusive philosophical

magic-lands without content.

     "Courts, too, are bound by the First Amendment." Id. at 327. It is clear that We the

People have a right to the freedom of speech, and that the exercise of that right forms the

bedrock of our democratic institutions. The fact that *where* We the People can exercise that right

is unsettled by no means indicates that law enforcement or courts can use this unsettlement for

unbridled censorship. In order for there to be any foundational security for free discussion, we

must not only acknowledge the interpretive problems presented by "forum analysis,"—namely,

amorphous and inconsistent conceptualizations of categorical content and significance—but also

resolve any such problems *in favor of the speaker*, giving "the benefit of any doubt to protecting

rather than stifling speech." Id. at 32, (citing WRTL, 551 U.S., at 469 (citing New York Times

Co. v. Sullivan, 376 U.S. 254, 269-270 (1964))). That stated, the area where Plaintiff was

petitioning is wholly, profoundly and explicitly compatible with discussing public questions.

The external grounds of the library are "the like" and the sidewalk is a sidewalk.

**H.      THE HISTORIC CONFINES OF FIRST AMENDMENT RIGHTS ARE SUBSTANTIAL.**

Attesting to the unsettled foundational precedent indicating where we may speak with other citizens about matters of public import without fear of criminal prosecution is the inability to pin down the narrowest grounds of vindicating Plaintiff's First Amendment rights. Yet another path of vindication remains: the holding that the First Amendment did not safeguard the rights of free speech in the Lloyd shopping center reasoned that no such protections were available on "private property used nondiscriminately for private purposes only" Lloyd, 407 U.S. at 567.   As the East Hills Mall property is a mesh of private property used for *both* "private" and public purposes, access to the entire East Hills Mall grounds for First Amendment activity without consent of the property owner is not precluded by Lloyd.

Plaintiff's case in point is significant not because it falls outside of the formalistic category of "private property used nondiscriminately for private purposes," Id. at 567 but because the fusion of public and "private" functions at issue here is but a symptom of the larger substantive phenomenon of public property decreasing in favor of privately owned property and its subsequent and undeniable effect of "diminish[ing] the effective *exercise* of rights so necessary to the maintenance of democratic institutions." Thornhill v. State of Alabama, 310 U.S. 88, 96 (1940) (emphasis added).

Moreover, the five justices who held that Vietnam War protesters could not distribute literature inside the Lloyd shopping center in Lloyd's 5-4 decision nearly fifty years ago did *not* elevate Fifth Amendment rights above First Amendment rights, but instead relied upon a context in which they believed there were adequate alternative avenues of communication (See Lloyd at

567 "It would be an unwarranted infringement of property rights to require them to yield to the exercise of First Amendment rights **under circumstances where adequate alternative avenues of communication exist.**") (emphasis added).  The importance of these "adequate alternative avenues of communication" is substantial: according to the Lloyd majority, it is the safeguarding of the "special solicitude" of the First Amendment when  "accommodations between the values of these [the First, Fifth and Fourteenth] amendments are necessary."  Id. at 567.

"The Framers of the Constitution certainly did not think these fundamental rights [the First Amendment rights of all citizens and the rights of private property owners] of a free society are incompatible with each other," Lloyd, 407 U.S. at 570 nor did they think the First Amendment an abstraction in the sky without particularized content, and accommodations are now necessary to preserve the free exchange of ideas that forms the bedrock of our democratic institutions.

 Unlike the Lloyd shopping center, which was a "relatively new concept in shopping center design," none of the shops at the East Hills Mall (and many other modern shopping centers) can be accessed from the surrounding publicly owned sidewalks. Lloyd, 407 U.S. at 553.  Like the Lloyd shopping center, some individuals also access the East Hills Mall via bus.  However, unlike the citizens of Portland, Oregon, who accessed the mall from a publicly owned bus stop nearly 50 years ago, folks accessing the East Hills Mall via bus arrive at public bus stops that are *located on the mall property*, resulting in the East Hills Mall having absorbed not one but two public uses.  More broadly, the number of individuals visiting the public library was a small fraction of those at the mall, and the percentage of individuals accessing either the mall or the library from the surrounding perimeter sidewalks likely extends at least two spaces beyond the decimal point. As it was below freezing in St. Joseph on January 30, 2018, not many folks

found themselves at public parks. "Rights of free expression become illusory when a State has operated in such a way as to shut off effective channels of communication," <u>Pruneyard Shopping Center v. Robins</u>, 447 U.S. at 91 (Marshall, J., concurring) and democracy just doesn't work like that.

"The safeguarding of these rights [the freedom of speech and of the press] **to the ends that men may speak** as they think on matters vital to them and that falsehoods may be exposed through the processes of education and discussion is essential to free government. Those who won our independence had confidence in the power of **free** and fearless reasoning and **communication of ideas** to discover and spread political and economic truth." <u>Thornhill v. State of Alabama</u>, 310 U.S. 88, 95 (1940) (emphasis added). As citizens, our rights to discuss public questions and speak with other citizens about matters of public import lie not with the historic bustling public squares, the parks which once served as gathering places, or the chemical composition of the cement traditionally associated with expressive activity. "Citizenship of the United States would be little better than a name if it did not carry with it the right to discuss national legislation and the benefits, advantages, and opportunities to accrue to citizens therefrom." <u>Hague v. CIO</u>, 307 U.S. at 513. This right we carry *with us* in the City of St. Joseph, Missouri, just like we carry it with us on the gridded, bustling sidewalks of Los Angeles, California. Indeed, freedom of speech presupposes the forum and is dependent upon it; to allege otherwise robs the term of all meaning. But neither citizenship nor the First Amendment to the United States Constitution are formalistic illusions, they are meaningful and substantial, and should be remembered as such.

## **CONCLUSION**

For the foregoing reasons, summary judgment on Count I should be granted in favor of

Plaintiff, and against Defendants.

Hague v. CIO, 307 U.S. at 515 ("Such use of the streets and **public places** has, from ancient times, been part of the privileges, immunities, rights and liberties of citizens.") (emphasis added); Cox v. New Hampshire, 312 U.S. at 574 ("[T]he question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge the right of assembly and opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to **public places**.") (emphasis added); Schneider v. State, 308 U.S. at 162 ("Similarly, in Hague, an ordinance was held void on its face because it provided for previous administrative censorship of the exercise of the right of speech and assembly in appropriate **public places**.") (emphasis added); Jamison v. Texas, 316 U.S. 413, 416 (1943) ("[O]ne who is rightfully on a street which the state has left open to the public carries with him there **as elsewhere** the constitutional right to express his views in an orderly fashion.")(emphasis added); Grayned v. City of Rockford, 408 U.S. at 115 ("The right to use a **public place** for expressive activity can only be restricted for weighty reasons.") (emphasis added); Lloyd, 407 U.S. at 564 ("Respondents could have distributed these handbills on any public street, on any public sidewalk, in any public park, or in **any public building** in the city of Portland.") (emphasis added); Minn. Voters All. v. Mansky, 138 S. Ct. at 1885 ("In a traditional public forum—parks, streets, sidewalks, **and the like**—")(emphasis added)

RESPECTFULLY SUBMITTED,

STACY ARNOLD, Plaintiff

 /s/Stacy Arnold
Stacy Arnold
500 Westover Dr. #11589
Sanford, NC 27330
803-428-7024
stacy.kaye.arnold@gmail.com

# CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was filed electronically with the Clerk of the Court on October 19, 2020, to be served by operation of the Court's electronic filing system upon:

Christopher L. Heigele
Steven F. Coronado
Bay Otto Coronado PC – KCMO
4600 Madison Avenue
Suite 210
Kansas City, MO 64112-3019
cheigele@batyotto.com
scoronado@batyotto.com
*Attorneys for Defendants*
*City of St. Joseph, Missouri,*
*Officer Rebecca Hailey*

Gregory P. Goheen
McAnany, Van Cleave & Phillips, PA-KCKS
10 East Cambridge Circle Drive
Ste. 300
Kansas City, KS 66103
ggoheen@mvplaw.com
*Attorneys for Defendant*
*St. Joseph Public Library*

_/s/ Stacy Arnold_____